IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:20 CR 53 MR WCM

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | MEMORANDUM AND |
| ) | RECOMMENDATION |
| TRAVIS JERRELL JORDAN ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the Court on Defendant's Motion to Suppress, which has been referred to the undersigned pursuant to 28 U.S.C. § 636. Doc. 16. Having carefully reviewed the evidence, arguments, and applicable authority, the undersigned respectfully recommends that the Motion be granted.

I. Relevant Procedural Background

On June 2, 2020, Defendant Travis Jerell Jordan was indicted on one count of knowingly possessing one or more firearms in and affecting commerce, knowing that he had previously been convicted of at least one felony, in violation of 18 U.S.C. § 922(g)(1). Doc. 1.

On June 29, 2020, Defendant was arraigned and entered a plea of not guilty.

On September 28, 2020, Defendant filed the Motion to Suppress. Doc. 16. The Government responded and Defendant replied. Docs. 22, 26.

1

On December 11, 2020, the undersigned held an evidentiary hearing. At the conclusion of the hearing, Defendant was granted leave to file a supplemental brief and the Government was given leave to respond. Those filings were made on December 18, 2020, and December 24, 2020, respectively.

## II. Factual Background

### A. Evidence Presented

At the hearing, the Government called two witnesses – Charlotte Ring, who was working as a teller at HomeTrust Bank on the day of Defendant's arrest, and Officer William Woods of the Asheville Police Department ("APD").

Prior to the hearing, Defendant submitted footage from body cameras worn by Officer Woods, and by Officer Hernandez and Lieutenant Lamb, who were also at the scene. Doc 22. These items were admitted, without objection, as Defendant's Exhibits 1 (Hernandez video), 2 (Woods video), and 3 (Lamb video), respectively. A supplemental incident report by Officer Woods was admitted during the hearing, without objection, as Defendant's Exhibit 5.[1]

### B. Factual Findings

Based on the information of record and as presented during the hearing, the undersigned finds the relevant facts to be as follows:

---

[1] The exhibits were pre-marked. No Exhibit 4 was offered.

On the afternoon of January 9, 2020, Thea Scarpulla ("Scarpulla") and Defendant entered a branch of HomeTrust Bank. They walked together to the teller station where Ms. Ring was working. Scarpulla presented a check to be cashed. The check was written on a HomeTrust Bank account and was shown as being payable to someone other than Scarpulla. Scarpulla also presented an identification card for the purported payee. Defendant stood with Scarpulla, but did not speak or participate in Scarpulla's interactions with Ms. Ring.

Ms. Ring reviewed the check and identification card provided by Scarpulla, a process that took approximately one minute. Ms. Ring noticed that the signature on the check did not match signatures on other checks previously written on the same account. She also noticed that the photograph on the identification card did not appear to depict Scarpulla. Ms. Ring did not mention her observations and suspicions, nor did she say the name that appeared on the check and identification card out loud. Rather, Ms. Ring told Scarpulla that she needed to get her manager's approval to cash the check.

Ms. Ring then walked into her manager's office, which was located nearby. Ms. Ring and her manager called the holder of the account on which the check was written and asked about the check. The account owner advised that her checkbook had been stolen and that she had not written the check in question. The bank manager then called the APD and reported that a fraudulent check was being presented. In her testimony, Ms. Ring did not

3

recall if her manager, in that call, reported anything other than that a fraudulent check was being cashed, including whether the check was being presented by one or two persons.

Ms. Ring and her manager waited in the manager's office for approximately 10 minutes for the APD to arrive. During this time, Defendant and Scarpulla stood and waited together by the teller counter. Also during this time, a bank employee, perhaps the bank's assistant manager, briefly advised Scarpulla that it would be "just a second" because the bank had to retrieve money from the vault to cash the check.

Ms. Ring and her manager tried to avoid arousing any suspicions by Defendant and Scarpulla in order to keep them in the bank until APD officers arrived. At no point did Ms. Ring or her manager tell Scarpulla or Defendant that they suspected a crime had occurred.

At 4:27 p.m., four APD officers, including Officers Woods, Gibson, and Hernandez, entered the bank; one had ridden a Segway and the others arrived on bicycles.[2] The bank manager met them and advised that she had spoken to the account holder, who had told her that "this girl" had stolen her checks and that she (the account holder) wanted to press charges. An officer inquired about

---

[2] Officer Woods indicated that Officers McCain and Bentz were originally dispatched to the scene but the four officers, including Officer Woods, heard the call and also responded as they were in the vicinity of the bank.

4

"the one trying to cash" the check and the manager responded that "she's at the teller line . . . the blonde woman standing at the teller line next to the black gentleman." The bank manager then gave the officers the check and the identification Scarpulla had presented. The officers examined these documents and then Officer Woods said, "Let's go ahead and talk to her."

Officers Woods, Hernandez, and Gibson approached Scarpulla and Defendant at the teller counter. The fourth officer stood farther away and observed. Officer Hernandez said, "Hi ma'am, so what's going on today, you guys?" Scarpulla responded and spoke to the officers briefly. It does not appear that she referenced Defendant, who remained standing beside her, silently.

After the officers had spoken with Scarpulla for approximately thirty seconds, Officer Gibson stated, "Do you mind if we talk away from the tellers?" Officer Woods responded, "Yeah, we can go over here." At that point, Officer Hernandez went to the manager's office to speak with the manager while the other three officers directed Scarpulla and Defendant to a set of chairs in the bank's lobby. It appears that as they were walking, Officer Gibson stated, "Can you guys have a seat for me." Defendant and Scarpulla sat beside each other in the sitting area.

The officers continued speaking with Scarpulla.

5

More officers subsequently arrived on the scene, making a total of at least six officers at the bank,[3] and the questioning of Scarpulla continued.

While the officers questioned Scarpulla, Defendant stayed seated beside her, but at first, no one spoke to him, and he spoke to no one. The officers stood in front of Scarpulla and Defendant in the sitting area. Two of the officers' bikes were parked between the sitting area and the entrance to the bank.

About two and a half minutes after Scarpulla and Defendant were seated in the sitting area, Officer Woods spoke to Defendant and asked him for his name, to which Defendant responded, "Travis Jones." Another officer asked how they had arrived at the bank and Defendant responded that they had walked.

Officers continued to question Scarpulla for her identifying information, which she had thus far not provided. Officer Woods then asked Defendant for his date of birth and Defendant provided a date. The officer who had asked Defendant how they arrived at the bank asked him whether they had a vehicle in the parking lot. Meanwhile, Officer Woods called in the name and date of birth that Defendant had given.

---

[3] From the video footage and Officer Woods' testimony, it appears that Officers Woods, Gibson, Hernandez, Booth, McCain, and Bentz as well as Sergeant Ziegler and Lt. Lamb may have been at the scene at one time or another, either inside the bank or in the parking lot.

6

The officers continued to question Scarpulla about her identifying information and documents. Eventually, Scarpulla allowed the officers to look through her wallet, where they discovered multiple identifications, and her purse.

Officer Woods asked Defendant to confirm his birthdate. Defendant provided a birthdate again, and, in response to other questions, explained that he was from Georgia, had a Florida's driver's license, and had been in Asheville for about a week.

While the officers were questioning Scarpulla, Lt. Lamb (who had been in the parking lot), approached the group and asked Defendant and Scarpulla whether they needed anything from a truck that was waiting in the parking lot, as the driver wanted to leave. Lt. Lamb also asked how Scarpulla and Defendant knew the driver. Defendant explained that the man had come to pick them up and that they had met him downtown. The officers continued to question Scarpulla, who had still not provided her true name and date of birth.

Subsequently, one of the officers questioning Scarpulla spoke to Defendant and said, "sir, will you step over here with me for a second, please?" He directed Defendant to a small table nearby where he continued to question Defendant.

As the officers had not been able to locate information for Defendant based on the name and birthdate he had provided, the officer asked if he could

7

check Defendant's wallet. After some discussion, Defendant handed his wallet to the officer who looked through it and found what appeared to be methamphetamine. He then asked Defendant to stand and handcuffed him. Before searching Defendant, the officer asked Defendant whether there was anything on Defendant's person that could hurt him. Defendant stated that there was a gun in his pocket. The officers then asked Defendant whether he was a felon, and he confirmed that he was. The officers searched Defendant, asked him more questions about his background and identity, and placed him under arrest.

### III. Analysis

Defendant contends that he was detained without reasonable suspicion at the moment the officers approached him at the teller counter and directed him to the sitting area, and argues that the Court should suppress the firearm he is charged with possessing along with any other evidence obtained after he was seized.

The Government disputes that Defendant was seized prior to his arrest, and argues that even if he was seized, the seizure was lawfully made, with reasonable suspicion, such that the evidence should not be suppressed.

#### A. Seizure

"[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1,

8

16 (1968). However, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." Fla. v. Bostick, 501 U.S. 429, 434 (1991).

"[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Fla. v. Bostick, 501 U.S. 429, 439 (1991).

> Courts consider numerous factors in this regard, including
>
>> (i) the number of police officers present at the scene; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they 'touched the defendant or made any attempt to physically block his departure or restrain his movement'; (v) 'the use of language or tone of voice indicating that compliance with the officer's request might be compelled'; (vi) whether the officers informed the defendant that they suspected him of 'illegal activity rather than treating the encounter as "routine" in nature'; and (vii) 'whether, if the officer requested from the defendant ... some form of official identification, the officer promptly returned it.'

United States v. Black, 707 F.3d 531, 537–38 (4th Cir. 2013) (internal citations omitted).

Here, Defendant contends that he was seized when the officers approached him and asked him to move to the sitting area because "a

9

reasonable person in Mr. Jordan's position would not have felt free to terminate the encounter with law enforcement and leave." Doc. 16 at 3. The Government argues that the encounter was voluntary.

On the day in question, a group of APD officers arrived at the bank in response to the manager's call. Four officers initially entered the bank; three of them approached Scarpulla and Defendant at the teller counter, while the fourth stood several feet away and observed.

Shortly thereafter, Defendant and Scarpulla were escorted to the sitting area by three officers, while Officer Hernandez went into the manager's office to speak with the manager. More officers arrived soon thereafter, making a total of at least six officers at the scene.

All of the officers were wearing uniforms that clearly identified them as members of the APD. Some of them were in bicycle uniforms, with shirts that were neon yellow on top, with the word "POLICE" emblazoned on the front and back, and with APD badges/patches on the sleeve and chest. Other officers wore traditional dark uniforms. None of the officers drew or displayed their weapons. However, all of the officers appeared to be wearing sidearms, which were visible in their holsters.

None of the officers appeared to touch Defendant until late in the encounter. When the three officers initially approached Scarpulla and Defendant at the teller counter, the officers stood in reasonable proximity to

10

them. Two of the officers' bikes were in the pathway leading toward the outside door and another bike was in a large entry way between the external doors and the internal door to the bank lobby.

The officers asked Scarpulla repeatedly for her personal information and explained what would happen if she refused to provide it and was arrested and booked as a "Jane Doe." Nonetheless, they were polite when speaking with both Scarpulla and Defendant and did not use harsh tones or severe language.

Based on the evidence presented, the undersigned is persuaded that a reasonable person in Defendant's position would not have believed he was free to decline the officers' requests for information or terminate the encounter.

While Defendant never affirmatively asked if he was free to leave, there is also no evidence that he was ever told he was not required to speak with the officers or asked if he would be willing to talk with them on a voluntary basis. When Scarpulla and Defendant were first approached at the teller counter, Officer Gibson did ask, "do you mind if we talk away from the tellers?" but the question appeared to be directed generally to Scarpulla and Defendant and a response was made by Officer Woods, not Scarpulla or Defendant. Further, during the hearing, Officer Woods testified that when he responded to Officer Gibson's question – saying that they could move to the sitting area – he was not asking a question. In short, these interactions and statements appeared to

11

be related to where the questioning would take place, not whether it would take place at all.

Likewise, though the officers did not appear, at least until suspected methamphetamine was found in Defendant's wallet, to tell Defendant he was suspected of some crime, the number of officers present at the scene, their physical positions relevant to Defendant and Scarpulla, and the questioning of Scarpulla, sometimes by multiple officers simultaneously—all of which occurred in the middle of a bank during business hours—constituted "a show of authority" that made it clear the encounter was not routine. Black, 707 F.3d at 538.

The officers were thoroughly courteous and respectful when they approached Defendant and Scarpulla at the teller counter, but a determination as to whether an individual has been detained is based on whether a reasonable person in the situation, bearing in mind the relevant factors, would have considered the encounter to be voluntary. And in that regard, it is noteworthy that Officer Woods himself testified that, at the time Scarpulla and Defendant were directed to the sitting area, they were not free to leave. Doc. 30 Transcript, p. 48 line 21 ("No. He would not have been free to leave.") and p. 49 line 7-8 ("We probably would not have let them leave if they tried to walk out.").

Accordingly, the undersigned is persuaded that Defendant was seized when the officers approached him at the teller counter and directed him to the sitting area.

### B. Reasonable Suspicion

In view of this conclusion, the question becomes whether the officers had reasonable suspicion at that moment to detain Defendant.

The "curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." Reid v. Georgia, 448 U.S. 438, 440 (1980). A stop is justified if "the police officer [can] point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Id. (internal quotation marks omitted). Courts consider "the totality of the circumstances in determining whether the officer had reasonable suspicion of criminal activity." United States v. Slocumb, 804 F.3d 677, 682 (4th Cir. 2015); United States v. Arvizu, 534 U.S. 266, 273 (2002).

Reasonable suspicion must be particularized as to a defendant; it arises when there is "a suspicion that the *particular individual being stopped* is engaged in wrongdoing." United States v. Cortez, 449 U.S. 411, 418 (1981) (emphasis added). "There is no reasonable suspicion merely by association." United States v. Black, 707 F.3d 531, 539 (4th Cir. 2013); see also United States v. Navedo, 694 F.3d 463, 468 (3d Cir. 2012)("The reasonable suspicion

13

required under *Terry* is specific to the person who is detained. . . . The Supreme Court has never viewed *Terry* as a general license to detain everyone within arm's reach of the individual whose conduct gives rise to reasonable suspicion.").

In this case, the officers came to the bank in response to a call from the bank manager about the presentation of a fraudulent check. There is no evidence that the bank manager reported that two people were involved in attempting to cash the check and, when the officers arrived at the bank, the manager specifically told them that the person attempting to cash the check was Scarpulla—"the blonde woman standing at the teller line next to the black gentleman." The officers proceeded to approach both Defendant and Scarpulla, and shortly thereafter directed them to the sitting area and to be seated.

At that point, the officers did not have sufficient information to indicate Defendant may have been involved in a crime. During argument, the Government contended that the officers had reasonable suspicion to believe Defendant was involved in criminal activity because Defendant stood by and watched while Scarpulla presented the stolen check and the false identification. However, there is no indication that Defendant was assisting with Scapulla's attempt to cash the check or that Defendant was even aware that Scarpulla was using a false identification or trying to cash a stolen check. Ms. Ring testified that Scarpulla was the one who handed her the check and

14

was the only one who spoke with her. Further, neither Ms. Ring nor her manager disclosed to Scarpulla and Defendant their concerns about the check or what they had learned from the account owner. Defendant did wait with Scarpulla while the bank was supposedly processing the check (and until the police arrived), but Defendant would have had little reason to believe that something was amiss as the delay was not so long as to be obvious in that regard.

In sum, while the officers' interest in wanting to speak with Defendant was understandable and legitimate, reasonable suspicion particularized to Defendant himself was lacking at the time Defendant was detained.

## IV. Recommendation

The undersigned therefore recommends that Defendant's Motion to Suppress (Doc. 16) be **GRANTED**.

Signed: January 12, 2021

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636(b)(1)(B), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).